P. C. Beezley and P. C. Beezley, Executor of the Estate of Esther W. Beezley v. Commissioner.
Beezley v. Commissioner
Docket No. 1256-67.
United States Tax Court
T.C. Memo 1968-206; 1968 Tax Ct. Memo LEXIS 92; 27 T.C.M. (CCH) 1015; T.C.M. (RIA) 68206; September 19, 1968. Filed Paul R. Cressman, Seattle, Wash., and Donald A. Cable, for the petitioners. Gary C. Randall, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency in the Federal income tax of petitioners for the calendar year 1963 in the amount of $21,553.85. The sole issue is whether petitioners are entitled to deduct $33,345.10 under section 165 [1] as a loss sustained during 1963 in connection with a transaction entered into for profit. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. P. C. Beezley (hereinafter referred to as petitioner) and Esther W. *93 Beezley were husband and wife [2] with their residence at Mercer Island, Washington, at the time the petition herein was filed. For the calendar year 1963 they filed a cash basis joint Federal income tax return with the district director of internal revenue at Tacoma, Washington. In 1960 petitioner had a 20 percent interest in a publishing and book distributing company in the New York area known as The Bookmailer, Inc. (hereinafter referred to as Bookmailer). Bookmailer's business consists primarily of the distribution by mail of books published in the United States to individuals, corporations, and governments anywhere in the world. In addition, Bookmailer publishes books, and at the time of trial herein had about 35 to 40 titles in print. Bookmailer sells approximately 200,000 books per year. In early 1960 the president and founder of Bookmailer, Lyle H. Munson, who was a personal acquaintance of petitioner, learned that there *94 was a possibility that the memoirs of Joseph Cardinal Mindszenty (hereinafter referred to as the cardinal) might be available. (It had been reported in the press at the time of the Hungarian Rebellion of 1956 that the cardinal had begun to write his memoirs upon taking refuge in the American Legation in Budapest after he had been freed from the communists by the Hungarian Freedom Fighters on October 30, 1956.) [3] Munson had been approached by Julius Tarlo, a grandnephew of the cardinal, who indicated that he had the authorization of the cardinal's family to obtain and publish the memoirs. Shortly after Munson was approached by Tarlo, Munson contacted petitioner and informed him of what had transpired. Munson advised petitioner that Bookmailer did not have sufficient financial resources to undertake the project of obtaining the memoirs and asked him whether he would be interested in financing the venture. After petitioner indicated *95 that he wished to participate in the venture, he was informed that as much as $7,500 might be needed for Tarlo to go to Europe for the purpose of fully investigating the possibility of getting the memoirs out of Hungary. Thereupon petitioner, Tarlo, and Munson, on behalf of Bookmailer, entered into an oral agreement consisting of the following terms: Petitioner agreed to underwrite the costs of obtaining the memoirs; if it was decided to publish the memoirs, Bookmailer agreed to pay the cost of publication; if the memoirs were published, Bookmailer would first recover its costs of publication, petitioner would then recover his outlay, and thereafter Bookmailer would receive 15 percent of the profits while petitioner and Tarlo would split the remaining 85 percent on an equal basis. This agreement was never reduced to writing. Tarlo traveled to Europe in the spring of 1960 and contacted a West German diplomat who had previously brought materials out of Hungary for him. The diplomat told him that he might be able to obtain the memoirs, but that in doing so it would be necessary to bribe certain officials. The diplomat indicated that because 1017 of the risk involved and the out-of-pocket *96 expenses he would have to incur he wanted approximately $25,000. Tarlo told the diplomat to go to Hungary and bring out the memoirs. In the summer of 1960 Tarlo and petitioner went to Vienna to meet with the diplomat. Petitioner gave the diplomat $25,000 in cash for what purportedly was half of the memoirs. The diplomat said that, for precautionary reasons, the other half would be delivered in a very short time. Petitioner and Tarlo were permitted to only make a cursory examination of the first half of the papers at the time they were given to them by the diplomat. Those papers were then brought to the United States by petitioner and Tarlo. In about three to four weeks the second half of the papers was delivered by mail to Munson's office in New York City. A careful examination of the materials disclosed that although they consisted of certain of the cardinal's writings concerning world problems, religion, freedom, and communism, as well as some of his sermons, and letters sent to President Eisenhower, the Pope, and Cardinal Spellman, they did not contain his memoirs. [4]
*97 Petitioner, Tarlo, and Munson had been hoping to find a detailed account by the cardinal of the brainwashing and subsequent trial he was subjected to by the communists in late 1948 and early 1949 and his experiences during the Hungarian Rebellion of 1956. In late 1960 another attempt was made to obtain the memoirs. However, this effort was also fruitless. In trying to obtain the memoirs during 1960, petitioner spent the sum of $33,345.10, broken down as follows: Payee
Amount
Lyle Munson
$ 7,500.00
West German Diplomat
25,000.00
Air France Airlines 845.10
Total
$33,345.10
Although the cardinal's personal memoirs were not secured and Bookmailer was under no obligation to publish what had been received, it was decided to publish the material that had been obtained because Munson believed that the venture could still be made profitable. A translator from Columbia University was hired to determine, on the basis of his fluency in Hungarian, how much of the material should be translated and to actually make the translation. A full and complete translation of more than 75 percent of the material was ultimately made. In 1962 "The World's Most Orphaned Nation" *98 (hereinafter referred to as the book) was published over the name of the cardinal by Bookmailer. With the exception of the preface, the publisher's foreword, and certain editorial comments and other materials specifically identified as being from sources other than the cardinal, the book is composed of approximately 50 percent of the material translated. Initially 10,810 copies of the book were printed. The costs of publication, including translation fees, incurred by Bookmailer amounted to $7,499. It was copyrighted in 1962 in the cardinal's name. Distribution efforts were begun by Bookmailer in February of 1962. The book carried a retail price of $3 but generally was sold by Bookmailer to wholesalers at $1.50 per copy. As part of the distribution effort 150 copies were mailed to various book review media four to five weeks in advance of the date of publication. Included in this mailing were complimentary copies to religious leaders and writers for Catholic publications. Book wholesalers and the retail trade were advised of the availability of the book and its purchase price through the trade publications "Books in Print" and "Publishers' Trade List Annual." "Books in Print," *99 which is cross-indexed by author and title, is a basic reference volume used by booksellers for ordering books. It lists approximately 190,000 titles and contains many books which while they are still in print are not actively selling. "Books in Print" is partially compiled from ads placed by publishers in "Publishers' Trade List Annual." All of the books published by Bookmailer which are currently in print are advertised in a full page advertisement in "Publishers' Trade List Annual." Bookmailer also advertised the book in its own book listing, "Bookmailer News," which is distributed bi-monthly to all established Bookmailer customers, numbering 25,000 to 28,000 persons in this country and abroad. Bound copies of the book were first available in May of 1962. The parties involved were disappointed by the reception 1018 the book received from the reviewers and commentators. Because of the cardinal's differences with the Papacy, Bookmailer was only able to get five Catholic publications to review it. The limited number of reviews created a lack of quotable material which, in turn, made distribution efforts quite difficult. For example, it was decided not to purchase advertising *100 space in the various media because there was not sufficient quotable material to fill the ads. For the calendar years 1962 and 1963 quarterly sales of the book were as follows: Year
Quarter
No. of CopiesSold
1962
1
2
831
3
453
4
702
1963
1
771
2
361
3
172$ L
4
105
During 1962 Bookmailer tried, without any success, to have a pocket book edition of the book published under the imprint of one of the nation's leading publishers of pocket books. Furthermore, in late 1962 and early 1963 negotiations were undertaken to have a private foundation established by a prominent Catholic layman underwrite the costs of placing the book in schools and libraries which could not otherwise afford to carry a book of this sort. These negotiations also were unsuccessful. After sales of the book had declined subsequent to the first quarter of 1963, Munson decided not to spend any additional money for promotion of the book. Before 1963 was over, Munson concluded that not only would no profit be derived from the book, but also that Bookmailer would not recover its costs of publication. Therefore, with the exception of the listings in "Books in Print" *101 and "Publishers' Trade List Annual," no efforts to sell the book were made after 1963. The price paid by Bookmailer for its advertisement in "Publishers' Trade List Annual" would not have been lowered if "The World's Most Orphaned Nation" had been deleted. The number of copies of the book sold during the years 1962-1967 and the amounts received from these sales are as follows: No. of
Amount
Year or Period
Copies Sold
Received
1962 - calender year
1986
$2,979.00
1963 - calendar year
1409
2,113.50
1964 - first 8 months
223
334.50
1965 - fiscal yr. ending 8/31/65
222
333.00
1966 - fiscal yr. ending 8/31/66
130
195.00
1967 - fiscal yr. ending 8/31/67
60
90.00
1967 - last 4 months 32
48.00
Totals
4062
$6,093.00
Bookmailer is entitled to the $6,093 derived from sales of the book. In 1966 Bookmailer consigned 1080 copies of the book to the head of the Hungarian Freedom Fighters organization in Washington, D.C. The price set was $1.08 per copy. Bookmailer has never been paid for these consigned copies and repeated efforts to locate the consignee have been to no avail. Generally, active sales of a book of the type of "The World's Most *102 Orphaned Nation" occur within a year after publication. When sales of the book declined in 1963, petitioner became convinced that he would never receive anything from the book. Consequently, he consulted with his certified public accountant and attorneys in order to decide what to do with respect to the Federal income tax treatment of the $33,345.10 he had spent in obtaining the cardinal's papers and having them published. It was decided to deduct this sum as a loss on his 1963 Federal income tax return. Petitioner has not by any overt action abandoned any rights he may have in the papers of the cardinal or in the book. The papers have no recognizable value independent of the book. Petitioner has no legal right to receive any additional writings of the cardinal. Opinion The issue is whether petitioner is entitled to deduct $33,345.10 under section 165 [5] as a loss sustained during 1963 in 1019 connection with a transaction entered into for profit. The parties agree that the issue hinges upon the question whether petitioner's investment ceased to have any recognizable value in 1963. *103 The question of when an investment ceases to have value is a factual one. Resolution of this question calls for a practical, not a legal, test. . The taxpayer's burden of proof does not require him to show that there is no possibility of ever recovering his investment. The statute does not require the taxpayer to be an "incorrigible optimist." . On the basis of the record as a whole, we think that the petitioner has carried his burden of showing that his investment became worthless in 1963. Respondent, in addition to arguing that petitioner's investment did not become worthless in 1963 because the book continues to have value, also urges with equal force that if a loss was sustained, it occurred in 1960, 1961, or 1962. We, however, are convinced that petitioner's investment had recognizable value until 1963. In 1960 petitioner spent $33,345.10 to obtain the memoirs of the cardinal. Although the memoirs were not secured, the papers that were obtained certainly were not worthless. Munson, an experienced publisher and distributor of books, testified that *104 these documents had historical significance and warranted publication with the prospect of making a profit. Rather than abandoning his investment, petitioner deferred to Munson's business judgment that the venture could still be made profitable by publishing the cardinal's papers. Thus, the transaction carried over into 1961, at which time a translation of these papers was begun. The translation was completed in early 1962 and a substantial part of its fruits was published in the form of a book in the spring of 1962. During 1962 the investment continued to have value. There were no identifiable events signifying that the transaction was closed. The sales picture was inconclusive. While the level of sales for the third quarter was not very satisfactory, sales during the second and fourth quarters were promising. Petitioner's investment, however, ceased to have any recognizable value in 1963. Sales of the book declined rapidly after the first quarter of 1963. Because of this decline in sales, Munson decided not to spend any additional money for promotion of the book. During 1963 Munson abandoned any hope that Bookmailer would recover its costs of publication. In 1963 petitioner became *105 convinced that he would never recover any of the money he had spent in obtaining the cardinal's papers and having them published and he therefore deducted his outlay as a loss on his 1963 tax return after consulting with his accountant and attorneys. Expert testimony was furnished by an experienced bookseller to the effect that active sales of the type of book with which we are dealing generally occur within a year after publication and it was first apparent in 1963 that the book would not sell 5,000 copies, the number that had to be sold before petitioner would begin to recover any of his investment. Moreover, the cardinal's papers ceased to have any recognizable value independent of the book when the book became worthless. On brief, respondent contends that a loss deduction should not be allowed for literary property in the absence of an overt act of abandonment on the part of the taxpayer. This proposition is not, however, supported by case law. Cases involving realty as well as those involving personalty only require abandonment in a practical sense. See, e. g., (C.A. 4, 1943), affirming ; *106 (C.A. 2, 1928), affirming , certiorari denied . This case is factually distinguishable from the cases cited by respondent. In view of the nature of the question before us, we do not think a detailed discussion of these cases is necessary. Because we have concluded that petitioner has met his burden of proof by demonstrating that his investment became worthless in 1963, we hold that he is entitled to deduct $33,345.10 under section 165 for the taxable year 1963. Decision will be entered for the petitioners. 1020 Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954.↩
2. Esther W. Beezley was a party only by virtue of filling a joint return. However, because she passed away on March 24, 1968, P. C. Beezley in his capacity as executor of the Estate of Esther W. Beezley has been substituted as a party in her place.↩
3. Although the parties have stipulated that the cardinal took refuge in the American Embassy in 1954, the Court takes note of the historical facts that he found haven as a guest of the United States in the American Legation on November 3, 1956.↩
4. The word "memoirs" is defined, in pertinent part, by Webster's New World Dictionary as a report or record of happenings that is based on the writer's personal observation and knowledge or special information.↩
5. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * * (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *↩